## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR SEARCH WARRANTS

I, James Manley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure, 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) for (1) a search warrant for historical information associated with Facebook name "Thirtyninth Streetery", Facebook ID # 100036807288965, URL: https://facebook.com/kapo.ninehunnid, (hereinafter "**Subject Facebook Account**"), believed to be used by Jonathan D. STORY, that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California; and (2) a search warrant for prospective location information associated with the **Subject Facebook Account**. Specifically, the information to be searched is described in the following paragraphs and in Attachment A, and the particular things to be seized are described in Attachments B-1 and B-2.

2.       I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a detective with the Kansas City Missouri Police Department and have been since September of 2003 within the Narcotics and Vice Division.  During my time as an investigator, I have conducted and assisted with various investigations involving narcotics and firearms violations.  I am currently assigned to the Illegal Firearms Squad as a Task Force Officer (TFO) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the U.S. Department of Justice and have been so since March of 2009.

3.       The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 922(g), (i), and (u), have been committed by Jonathan D. STORY. Accordingly, there is probable cause to search the property described in Attachment A and seize information and items described in Attachment B-1 and B-2. There is also probable cause to believe that the location information described in Attachment B-1 and B-2.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant to Facebook because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a "district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND OF THE INVESTIGATION

6.      On December 7, 2020, at approximately 2300 hours, two unknown suspects attempted to break into the front door of Blue Steel Guns & Ammo, an ATF licensed Federal Firearms License (FFL), located at 6326 Raytown Road, Raytown, MO 64133. The suspects spent several minutes trying to pry or kick the door open. Eventually the alarm was activated, and the suspects ran off. Since the suspects were unable to make entry, nothing was stolen from Blue Steel Guns & Ammo.

7.      Investigators reviewed the video footage from Blue Steel Guns & Ammo. The suspects were wearing masks, hats, and jackets. The suspects appear to be focused on the door and

then abruptly stop what they are doing and run away from Blue Steel Guns & Ammo.

8.      On December 8, 2020, at approximately 0030 hours, unknown suspects climbed onto the roof of Drum Magazines, LLC, an ATF Licensed FFL, and made entry to the business through the ductwork and air conditioning system. Once inside the Drum Magazine, the suspects spent about an hour inside collecting firearms. The alarm system did not alert police or the owner, but the cameras were functioning.

9.      After the firearms were collected, the suspects spent several minutes attempting to break out through the front door which was fortified with an iron security gate. The suspects eventually broke through the gate, and made their way to a waiting vehicle. The suspects dropped firearms on the way out the doorway and in the parking lot. A city service vehicle discovered the burglary and notified the Kansas City, Missouri Police Department (KCMOPD).

10.     The Drum Magazine's owner, Charles Weston, told investigators he was notified of the burglary by the KCMOPD and responded immediately. Mr. Weston reviewed the video and the structure of the business and determined that the suspects had entered the business through the roof, and then through the HVAC system in the ceiling. Both suspects were wearing gloves. While reviewing the video footage, investigators noted one of the suspects appears to make a phone call. A short while later a silver colored Acura sedan with what appears to be a bullet hole in the side pulled up in front of Drum Magazine. The suspects got into the vehicle and left the scene.

11.     ATF Industry Operations Investigators completed an inventory for Drum Magazine and determined 81 different firearms were missing. Investigators reviewed the video footage for Drum Magazine and compared it to the footage at Blue Steel Guns & Ammo. Investigators noted the suspects were the same size and build as the suspects who attempted to break into Blue Steel Guns & Ammo an hour and half prior to breaking into Drum Magazine. The suspect's jackets also

appeared to be exactly the same. One of the suspects was wearing a jacket with stripes that were clearly visible in both Blue Steel Guns & Ammo's video surveillance and in Drum Magazine's video footage.

12.     On December 8, 2020, at approximately 2330 hours, KCMOPD responded to a car on fire at the intersection of 19th and Walrond Avenue, Kansas City, MO. The vehicle matches the description of the vehicle investigators saw in the surveillance video footage at Drum Magazine, a silver colored Acura sedan with a bullet hole in the same location. The silver Acura sedan was recently sold at an auction and had not been registered to its new owner.

13.     On December 12, 2020, Independence, MO Police Department (IPD) Officers arrested Clinton PATT at Dick's Sporting Goods, located in the Independence Center shopping mall, for shoplifting. During the course of the arrest, PATT physically resisted arrest and attempted to remove a firearm from his waistband. Once PATT was placed in handcuffs, officers recovered the firearm. It was a Sig Sauer pistol that had recently been stolen from Drum Magazine.

14.     Later the same day, investigators conducted a post-*Miranda* interview with PATT. When asked about the firearm, PATT stated he found the firearm on the ground near the intersection of Prospect and 45th in Kansas City, MO. PATT stated he did not know the firearm was stolen and was adamant he found the firearm on the ground. PATT was released on bail.

15.     On December 14, 2020, investigators learned the silver Acura was recently sold to Clinton PATT. PATT is a suspect in the investigation and investigators believe PATT may have been the "getaway driver," driving the silver Acura away from Drum Magazine. Based on my training and experience, I know criminals often have a "getaway driver," who also acts as a "look out" person. This third party often sits in a vehicle watching for police or anyone else who might catch the criminals in the act of committing a crime like burglary. The third party will then notify

the criminals someone is coming via text message, phone call, social media message, or another signal. The third party will have the vehicle ready to flee the scene as soon as the criminals arrive. PATT has not cooperated with the investigation and investigators are currently unable to identify PATT's accomplices.

16.     While reviewing surveillance video from Drum Magazines, LLC, the suspects that entered the store were observed wearing purple latex gloves. When the scene was processed, a piece of purple latex glove was observed. That piece of glove was swabbed for DNA. On January 13, 2021, Forensic Specialist IV Jarrah Kennedy analyzed the swab that was taken and it was determined that Bobby BOOKER (BM, 01-25-1997) was developed as a major contributor and that the genetic information from the swab is 1 octillion times more likely to be observed if BOOKER and four unknown individuals are the contributors than if five unknown individuals are the contributors.

17.     On February 25, 2021, BOOKER was arrested for a federal warrant and a *Mirandized* interview was conducted by Special Agent Charles Backer and TFO/Detective James Manley of the Alcohol, Tobacco, Firearms and Explosives.

18.     During the interview, BOOKER admitted to committing the FFL burglary at Drum Magazines, LLC with PATT, who was the driver of the Acura that was determined to be the suspect vehicle.

19.     BOOKER identified the third unknown male committing the burglary with him as a male that goes by "Tray Nine" whom he previously served a prison sentence within Department of Correction (DOC) in Cameron, Missouri.  BOOKER advised he communicates with "Tray Nine" via his Facebook Messenger account he identified as "Thirtyninth Streetery." Analyst Davis who is assigned to the Narcotics and Vice Division conducted an inquiry into the Facebook account

and found a possible suspect as Jonathan D. STORY (BM, 06-13-1997).

20.     During the interview, BOOKER was shown a photograph of STORY and he positively identified STORY as being the other co-conspirator who committed the burglary at Drum Magazines, LLC on December 8, 2020. A further look into STORY's criminal history revealed that he was a convicted felon and that prohibits him from possessing firearms.

21.     BOOKER stated that he kept three (3) stolen firearms from the burglary, and later sold them. PATT and STORY split all of the other stolen firearms between them.

22.     A review into social media revealed that STORY has been "active" on Facebook since November 1, 2020 to as recent as February 23, 2021 and he has been utilizing the Facebook Account profile name as "Thirtyninth Streetery" with an URL of https://www.facebook.com/kapo.ninehunnid.

23.     I utilized an internet-based tool designed specifically to research and identify the unique Facebook UID of the **Subject Facebook Account** which was determined to be 100036807288965. Based upon my training and experience, I know that numerical Facebook UIDs are unique and cannot be changed by the user, even if other account attributes such as the vanity name have been changed by the user. The only way for a Facebook user to obtain a new UID is to create a new user account which can be easily distinguished from other user accounts.

24.     In my experience, similar to investigative practices commonly employed with cellular telephones, subscriber information and other account details in conjunction with pen register and trap and trace information pertaining to Facebook user accounts have yielded information in previous investigations that is relevant and material to Investigation Type investigations. Such information generates leads relating to the names of family members, associates, friends, and other individuals that the subject may communicate with whom may assist,

aid, or otherwise conceal the criminal activity of the subject. Pen register and trap and trace information will reveal the date, time, name(s) of parties involved, and internet protocol (IP) address used by the **Subject Facebook Account** during the communication, even if the communication was not visible to the public. This information can then be used in conjunction with additional legal process to identify a physical location, or potentially the identifiers of a mobile device, used to access the **Subject Facebook Account**.

25. In my training and experience, I have learned that Facebook has technical capabilities that allows it to collect and generate location data including GPS data or latitude-longitude data and other location information for each device accessing Facebook.

26. Based on my training and experience, I know that Facebook can collect location data including GPS data or latitude-longitude data and other location information for each device accessing Facebook.

## INFORMATION ABOUT FACEBOOK

27. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

28. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

29.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request". If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

30.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook. Depending on the user's privacy settings, Facebook may also obtain and store the physical location of the user's device(s) as they interact with the Facebook service on those device(s).

31.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their

Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

32.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when he or she uploaded the photo or video. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

33.     Facebook users can exchange private messages on Facebook with other users using Facebook Messenger. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

34.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

35.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

36.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

37.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

38.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

39.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

40.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

41.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may

communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

42.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the IP addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each

other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

43.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, other account information and prospective location information.

44.     I anticipate executing the warrant to Facebook under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B-1. Upon receipt of the information described in Section I of Attachment B-1, government-authorized persons will review that information to locate the items described in Section II of Attachment B-1.

45.     With respect to the requested search warrant relating to prospective location information, I request that the Court issue this warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c). I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the

warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Subject Facebook Account** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1).

46.      Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Subject Facebook Account** outside of daytime hours.

## REQUEST FOR SEALING

47.     I further respectfully request that the Court order that all papers in support of these applications, including the affidavit and search warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation. Based upon my training and experience, I have learned that criminals actively search online for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate, *i.e.*, post them publicly online. Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates and threaten or harm witnesses.

Respectfully submitted,

James Manley
Task Force Officer
Alcohol, Tobacco, Firearms and Explosives

Telephonically
Subscribed and sworn to before me via reliable electronic means on the ___2nd___ day of April 2021.

HONORABLE JILL A. MORRIS
United States Magistrate Judge
Western District of Missouri